13 CIV 7094

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ANITA SALBERG and FAMILY ESTATES
DEVELOPMENT COMPANY INC.,
individually and on behalf of all others
similarly situated,

                  Plaintiffs,

      v.

MEADOWBROOK INSURANCE GROUP,
INC., ROBERT S. CUBBIN, and KAREN M.
SPAUN,

                  Defendants.

**JURY TRIAL DEMANDED**



## CLASS ACTION COMPLAINT

Plaintiffs Anita Salberg and Family Estates Development Inc. (the "Plaintiffs"), by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for this Class Action Complaint (the "Complaint"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation made by Plaintiffs' counsel, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Meadowbrook Insurance Group, Inc. ("Meadowbrook" or the "Company"), as well as media and analyst reports about the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of the common stock of Meadowbrook between January 25, 2012 and August 14, 2013,

inclusive (the "Class Period").   Plaintiffs seek to pursue remedies against defendant Meadowbrook and certain of its most senior executives under Section 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.  The "Individual Defendants" include Meadowbrook's President and Chief Executive Officer, Robert S. Cubbin ("Cubbin") and Karen M. Spaun ("Spaun"), who is Meadowbrook's Chief Financial Officer.  Defendant Meadowbrook and the Individual Defendants are collectively referred to herein as (the "Defendants").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction in this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. 78aa.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§78j and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b.5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

3.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b) as the Company conducts business in this District and the alleged misconduct was transacted in and emanated from this district.

4.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

### Plaintiffs

5.     Plaintiffs, as set forth in the accompanying Certifications, incorporated by reference herein, purchased Meadowbrook common stock at artificially inflated prices during the Class Period and have been damaged.

### Defendants

6.     Defendant Meadowbrook is a Michigan corporation with its headquarters located at 26255 American Drive, Southfield, Michigan 48034. The Company's common stock is listed on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "MIG" and, as of August 12, 2013, the Company had more than 49 million shares of its common stock outstanding. Meadowbrook was founded in 1955 and is based in Southfield, Michigan. Meadowbrook purports to be a specialty insurance underwriter and insurance administration services company that serves the needs of underserved market segments that value service and specialized knowledge. The Company markets and underwrites specialty property and casualty insurance products on both an admitted and non-admitted basis through a broad and diverse network of independent retail, wholesale program administrators and general agents. Meadowbrook focuses on niche or specialty program business and risk management solutions for agents, professional and trade associations, pools, trusts and small to medium-sized insureds. These solutions include specialty program underwriting; excess and surplus lines insurance products; alternative risk transfer solutions, agency operations and insurance administration services.

3

7. Defendant Cubbin is, and was at all relevant times, the Company's President and Chief Executive Officer.

8. Defendant Spaun is, and was at all relevant times, the Company's Senior Vice-President and Chief Financial Officer.

9. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false and misleading information conveyed in Meadowbrook's public filings, press releases and other group-published documents addressed herein reflect the collective work of the Individual Defendants. Each of the Individual Defendants, by virtue of his or her position with the Company, was a corporate insider and directly participated in the day-to-day operations and affairs of the Company at the highest levels and was privy to confidential proprietary information regarding the Company and its business operations, products, growth, financial statements and financial condition, as alleged herein. During the Class Period, the Individual Defendants were involved in the drafting, preparation, review and/or dissemination of the various public, shareholder and investor reports and other communications which contained the materially false and misleading information alleged herein and were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. The Individual Defendants signed numerous materially false statements filed with the SEC.

10. Throughout the Class Period, Defendants Cubbin and Spaun, were responsible for ensuring the accuracy of Meadowbrook's public filings and other public statements, and they personally attested to and certified the accuracy of Meadowbrook's

4

financial statements. During the Class Period, the Individual Defendants participated in preparing, reviewing, approving and/or certifying consolidated financial statements for Meadowbrook that purported to conform with applicable regulatory requirements and Generally Accepted Accounting Principles ("GAAP"). These financial statements were filed with the SEC, and disseminated to the public, through inter alia, Company press releases, quarterly reports on Forms 10-Q and annual reports on Forms 10-K, and in other communications with investors, credit rating agencies, bank lenders and securities analysts. The financial information contained therein misrepresented that Meadowbrook's financial statements were accurate.

11.     The Individual Defendants were aware of, or recklessly disregarded, the misstatements contained in the SEC filings, press releases and other public statements complained of herein, and their materially false and misleading nature. Because of their executive and managerial positions, each of the Individual Defendants had access to the materially adverse undisclosed information about Meadowbrook and its financial condition and performance as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the representations made by them or Meadowbrook materially false and misleading.

12.     As officers and/or directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets,

5

management, earnings and present and future business prospects, and to correct any previously issued statements that were known to have become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information, but failed to do so.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company discussed herein. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the SEC filings, press releases and other public statements detailed herein and is therefore liable for the representations contained therein.

## CLASS ACTION ALLEGATIONS

14. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Meadowbrook common stock during the period between January 25, 2012 and August 14, 2013, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and Defendants' insurers.

6

15.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Meadowbrook's common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are tens of thousands of members in the proposed Class who are geographically dispersed throughout the United States. Members of the Class may be identified from records maintained by Meadowbrook or its transfer agent and may be notified of the pendency of this action by mail, using the form(s) of notice customarily used in securities class actions.

16.     Plaintiffs' claims are typical of the claims of the members of the Class, because all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

17.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the numerous questions of law and fact common to the Class are:

> (a) whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about Meadowbrook;
>
> (c) whether the Defendants caused Meadowbrook to issue false and misleading financial statements during the Class Period;

7

(d) whether Defendants acted with scienter;

(e) whether reliance upon Defendants' alleged false and misleading statements can be presumed pursuant to the fraud-on-the-market doctrine;

(f) whether and to what extent the market price of Meadowbrook's stock was artificially inflated during the Class Period as a result of Defendants' violations of the securities laws; and

(g) to what extent the members of the Class have sustained damages resulting from Defendants' violations of the federal securities laws and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for many members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.    Throughout the Class Period, Defendants knowingly made material false and misleading statements about the Company's financial condition and operating results. Specifically, Defendants failed to disclose that adverse market conditions materially impaired Meadowbrook's business operations and the value of its intangible assets. The value of Meadowbrook's assets included the acquisition of ProCentury Corporation's ("ProCentury") excess and surplus lines of business. Meadowbrook's failure to timely write down the value of its overstated assets caused the Company's reported operating results during the Class Period to be materially inflated. As explained below, Defendants also touted the way Meadowbrook operated its business lines including its reserve process. The Defendants specifically led investors to believe that it had a culture of

8

disciplined claims handling and reserve processing.  In truth, throughout the Class Period Defendants' failed to disclose and misrepresented the following material adverse facts which were known to them: (a) that Meadowbrook's reported goodwill and intangible assets were materially overstated; (b) that, as a result of its failure to timely write-down goodwill, the Company's financial results during the Class Period were materially overstated; (c) that the Company had not stabilized its reserves; (d) that the Company's financial statements were not prepared in accordance with GAAP and, therefore, were materially false and misleading; (e) that the Company had not terminated all of its underperforming programs; (f) that the impairment charges were understated, and goodwill, total assets, stockholders equity, net income and deferred income and taxes were overstated; and (g) that the Company failed to develop and implement adequate internal controls to insure that the Company's financial results were adequately reported.

**Background - The ProCentury Merger**

21.     On February 20, 2008, Meadowbrook and ProCentury announced they had executed a definitive merger agreement for a transaction valued at approximately $272.6 million in cash and stock to be paid to ProCentury shareholders.  ProCentury is a specialty insurance company that primarily underwrites general liability, commercial property, environmental, garage, commercial multi-peril, commercial auto, surety, and marine insurance primarily. This business is primarily in the excess and surplus lines or "non-admitted" market and is distributed through a select group of general agents.

22.     The purpose of the ProCentury acquisition was to expand and complement Meadowbrook's specialty lines capabilities with ProCentury's insurance professionals

and product expertise in the excess and surplus lines market. Commenting on the transaction, Defendant Cubbin stated:

> The combination of these two companies creates a diversified platform and gives both companies the size and product depth to compete at a level that couldn't be achieved as separate entities. We believe there are significant revenue opportunities for both sides, as well as cost savings potential. We expect meaningful accretion to earnings and will be in a position to offer specific guidance on this in the near future.

23.    On February 21, 2008, during an investor conference call defendant Cubbin responded to a question about why Meadowbrook was entering into the transaction with ProCentury by stating that:

> The cultures between Meadowbrook and ProCentury are very much the same. They have a very, very strong balance sheet. They have a very experienced team of people who have just done an outstanding job in building out their business. We expect to see...the other thing that we see very significantly is that you know *they have a huge market for the excess and surplus lines that we have never accessed before*. Their distribution system is not overlapping with ours. So, we do expect to see some very significant opportunity to provide our products to their distribution system and vice versa. Now, the growth synergies, the strong balance sheet, the very solid management team they've got some technology capabilities that we think are excellent on the excess and surplus client delivery side. They've got great a team of claims people. So, it really was a very, very good fit for us Tom and that's really why a lot of [us] think successful transactions come down to the right people, and that was certainly a very, very important part of this as well. (emphasis added).

24.    As with all insurance companies, Meadowbrook is subject to financial strength ratings produced by external rating agencies. Higher ratings from a rating agency generally indicate greater financial stability and a stronger ability to pay claims. Ratings are assigned by rating agencies to insurers based upon factors they believe are important to policyholders. A.M. Best Company ("AMB") is a global full-service credit

rating agency dedicated to serving the insurance industry. AMB's credit ratings are independent opinions regarding the creditworthiness of an issuer or debt obligation. AMB's credit ratings are based on a comprehensive quantitative and qualitative evaluation of a company's balance sheet strength, operating performance and business profile, or, where appropriate, the specific nature and details of a debt security. AMB's ratings are designed to assess an insurer's financial strength and ability to meet continuing obligations to policyholders.

25.    On February 27, 2008, AMB maintained Meadowbrook's financial strength rating of A- (Excellent) as a result of the planned merger with ProCentury.

26.    On July 28, 2008, Meadowbrook and ProCentury announced the completion of the merger. Defendant Cubbin stated: "The Meadowbrook and ProCentury management teams have been working together diligently to insure a smooth transition to form one cohesive organization. Many initiatives are underway to develop the numerous growth opportunities created by this merger of two strong, experienced and disciplined operations."

27.    The ProCentury Merger closed on July 31, 2008.

28.    Goodwill is created by acquisitions and represents the amount paid by the buyer in excess of the fair value of the assets being acquired. It is carried as an asset on the balance sheet and is not amortized but is reviewed at least annually for impairment. If impaired, the Company would be required to write down the goodwill by the amount of the impairment, with a corresponding charge to net income.

29.    According to Meadowbrook's Form 10-K for the year ended 2008, the Company is required to test, at least annually, all existing goodwill for impairment using

a fair value approach, on a reporting unit basis. According to the 2008 10-K, the Company's annual assessment date for goodwill impairment testing is October 1st or if there is a triggering event.

30. On November 3, 2008, Meadowbrook issued a press release and reported its third quarter results for the quarter ended September 30, 2008. The Company reported that during the third quarter period of 2008, Meadowbrook's acquisition of ProCentury resulted in an increase of estimated goodwill of $48.8 million.

31. On November 10, 2008, the Company filed its 10-Q report for the quarter ending September 30, 2008 with the SEC. The Form 10-Q contained signed certifications pursuant to Sections 906 of the Sarbanes-Oxley Act of 2002 by Defendants Cubbin and Spaun stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting. In that report, the Company reported that its goodwill increased from $43.4 million (for the period ending December 31, 2007) to $108.6 million (for the period ending September 30, 2008). The majority of the increase in goodwill was a result of the ProCentury merger.

32. In July 2009, Meadowbrook's subsidiary, Star, purchased a 28.5% ownership interest in Midwest Financial Holdings, LLC ("MFH"). MFH is a limited liability holding company with the primary purpose of providing workers' compensation insurance coverage for a variety of businesses. MFH's holding company system consists of a managing general agency and an insurance company.

33. On March 15, 2010, the Company filed its 10-K report for the year ending December 31, 2009 with the SEC which was signed by defendants Cubbin, Spaun and the

Company's directors. The Company reported that it had determined there were no triggering events that would indicate any potential goodwill impairment as of December 31, 2009.

34.    On March 16, 2011, the Company filed its 10-K report for the period ended December 31, 2010 with the SEC signed by defendants Cubbin, Spaun and the Company's directors. The Company reported that it had determined there were no triggering events that would indicate any potential goodwill impairment as of December 31, 2010.

**Defendants' False and Misleading Statements**

35.    Meadowbrook is required to establish reserves for losses and expenses related to the adjustment of losses for the insurance policies that it writes.    In the insurance business, several years may elapse between the occurrence of an insured loss, the reporting of the loss and the actual payment of the loss.

36.    Starting after the acquisition of ProCentury, between 2009 and 2011, Meadowbrook reported strong overall financial results throughout its business lines. For the years ended 2011, 2010 and 2009, the Company reported operating income of $40.9 million, $58.2 million and $53.5 million respectively. During this period, it touted itself to investors as a strong growing business. On information and belief, Meadowbrook's financial results were actually a product of Defendants' management of the reserves taken in each of the Company's business lines. For quarter after quarter between at least 2009 and 2010, Meadowbrook estimated far greater reserves than were necessary. The Company's strong financial results and combined ratio were continuously a product of "favorable development" on prior accident year loss reserves.    In the Company's

13

Commercial Multiple Period and General Liability ("CMPGL") business line (which included the excess liability program which was acquired in the ProCentury transaction), for 12 consecutive quarters, Meadowbrook benefited from a decrease its loss estimates for prior years.  Specifically, the Company reported the following decreases in its ultimate loss estimates for its CMPGL business:  1Q 2009: $3.7 million; 2Q 2009: $5.7 million; 3Q 2009: $7.1 million; 4Q: 2009: $9.4 decrease; 1Q 2010:  $6.2 million; 2Q 2010:  $9.1 million; 3Q 2010: $14.2 million; 4Q 2010: $20.7 million; 1Q 2011:  $4.8 million; 2Q: $4.0 million; 3Q 2011: $5.2 million; 4Q 2011: 20.7 million.

37.    The motive was clear as Defendants' practice allowed the Company to manage its earnings, net worth, goodwill and keep the Company's stock at an artificially high price. The improper reserve management also permitted the Company to maintain its loan covenants and its financial strength rating of A – (Excellent) with AMB.

38.    Unfortunately for the Defendants, starting in 2012, the reserve management would catch up with the Company as Meadowbrook's reserves needed to be increased dramatically.

39.    As set forth in more detail below, on August 14, 2013, after reporting two years of unchanged goodwill, the Company announced that it would take a non-cash impairment of goodwill of $115.4 million in the three months ended June 30, 2013. The impairment charge wiped out 95% of the Company's goodwill on its balance sheet, and caused the Company to violate "financial covenants" applicable to the certain credit facilities.  Given Defendants "granular review" of Meadowbrook's results, Defendant could not honestly hold the belief that its goodwill was unimpaired throughout the Class Period.  Basic accounting principles required Meadowbrook to write down goodwill

assets at the time they were impaired. Defendants knew that a proper and timely disclosure of the impairment of goodwill would cause a decrease in the value of Meadowbrook stock and would cause the Company to violate "financial covenants" applicable to certain credit facilities.

40.     Contrary to Defendants' public representations, the Company did not operate under a "culture of disciplined underwriting, claims handling & reserving" and with a "balance business model" allowing it to "adapt to changing market conditions and deliver more predictable results." In fact, throughout the Class Period, in an effort to maintain its AMB high rating, Defendants improperly managed the Company's reserves and ignored that its goodwill was impaired.

41.     On January 25, 2012, the Company announced that it expected to record a pre-tax expense of $7.7 million in the fourth quarter of 2011 to strengthen loss reserves. The Company stated that this adjustment to overall reserves was less than 0.09% of the Company's $879 million of net loss reserves and the after-tax impact of this re-estimate is $5.0 million, or $0.10 per diluted share. The Company further reported that it expected to report positive fourth quarter net operating income and full year 2011 net operating income of $0.77 per diluted share to $0.79 per diluted share. Defendant Cubbin was quoted as stating:

> Consistent with our culture of responding quickly to adverse experience, we strengthened our reserves in select lines of business during the fourth quarter. Over the past twenty-four months we have taken significant rate and underwriting action and we will continue to seek additional rate and underwriting actions for lines of business that are not meeting our profitability targets. Overall we have been pleased with the rate increases achieved for the 2010 and 2011 policy years. We are also pleased with the performance of our California workers' compensation book of business as all indications are that rate increases are keeping up with the underlying loss trends and overall the business remains profitable.

15

Commenting on the 2012 outlook, Defendant Cubbin further stated:

> While we are disappointed in the loss results for 2011, we are confident
> we can deliver better earnings in 2012. We have been actively monitoring
> our business by line, by state, and by class of business and have responded
> to a challenging market with appropriate underwriting and rating actions
> to help us return to a more acceptable level of underwriting profit. We
> remain optimistic about our future prospects and believe our balanced
> business model positions us well to deliver good results despite the low
> interest rate environment and competitive pricing conditions. (emphasis
> added).

42.     The Company's January 25, 2012 press release further reassured investors

that because of the $7.7 million expense to strengthen loss reserves that the Company

was well poised to deliver increase earning in 2012. Specifically, the January 2012 press

release stated:

> The loss reserve strengthening reflects higher than expected losses on
> isolated prior accident years in automobile liability, excess lines and
> workers compensation. This was partially offset by continued favorable
> development in other lines, particularly medical professional liability and
> general liability, although at lower levels of redundancy than in the recent
> past quarters.

43.     On February 14, 2012, Meadowbrook issued a press release reporting on

the Company's fourth quarter 2011 and full year 2011. For the fourth quarter 2011, the

Company reported that net income for the quarter was $8.8 million, or $0.17 per diluted

share, compared to $15.4 million, or $0.29 per diluted share in the prior year quarter. The

Company also reported that the 2011 pre-tax results included a $7.3 million increase in

the estimate for prior year ultimate losses and loss adjustment expense reserves. The

after-tax impact was $4.8 million.  The pre-tax increase represented approximately 0.9%

of carried reserves as of December 31, 2010. This change in estimate reflected higher

than expected losses on isolated prior accident years in automobile liability, excess lines and workers compensation. Once again defendant Cubbin stated:

> Consistent with our culture of responding quickly to adverse experience, we increased our reserves in select lines of business during the year. Over the past twenty-four months we have taken significant rate and underwriting action and we will continue to seek additional rate and underwriting actions for lines of business that are not meeting our profitability targets. We remain pleased with the performance of our California workers' compensation book of business as indications are that rate increases are keeping up with the underlying loss trends and overall the business remains profitable. During 2011 we faced a range of challenges including an unusually high frequency of storms during the second quarter, sustained soft market pricing conditions, and a prolonged low interest rate environment. Despite these challenges, we delivered profitable underwriting results, increased our book value per share by 12.8% and enhanced our future growth potential by continuing to develop and build out our specialty insurance underwriting capabilities. We will continue to monitor our business results on a granular level, taking any indicated pricing and underwriting actions for lines of business that are not meeting our profitability targets. (emphasis added).

44.    On February 17, 2012, the Company gave an investor presentation and the Defendants touted a "culture of disciplined underwriting, claims handling & reserving." The investor presentation also touted that the Company's "balance business model" allows it to "adapt to changing market conditions and deliver more predictable results." The presentation further represented that the Company's "high quality investment portfolio is well matched to our loss reserves and generates a predictable stream of income."

45.    The statements made in ¶¶41-44 above were each materially false and misleading because they failed to disclose and misrepresented material adverse facts which were known to Defendants or recklessly disregarded by them because contrary to Defendant Cubbin's statement that Meadowbrook had a "culture of responding quickly to adverse experience" and that its results are being monitored on a "granular level",

Meadowbrook was operating with woefully deficient internal controls, resulting in inaccurate and misleading financial disclosures, including the improper reporting of its loss reserves and goodwill.

46.     On March 15, 2012, Meadowbrook filed its Form 10-K report for the year ended December 31, 2011 with the SEC which was signed by defendants Cubbin, Spaun and the Company's directors.  For the year ended December 31, 2011, the Company recorded $120 million of goodwill.  The 2011 10-K reported that the Company determined that, as of December 31, 2011, there were no trigging events that would indicate a goodwill impairment was required.  The Company did not record any impairment to its goodwill during 2011, 2010 and 2009.

47.     As part of the 2011 10-K, Defendants portrayed the Company as safe, conservative and efficient with regard to its various business lines.  The Company also touted its disciplined reserve process.  For example, in the Company's 2011 Form 10-K, the Company explained that it had a culture of disciplined claims handling and reserving:

> *Culture of Disciplined Underwriting, Claims Handling & Reserving*:
> Our associates have significant experience across all functions of our
> business including underwriting, claims handling, and reserving.
>
> ***
>
> We have also built a robust control environment where underwriting
> trends are closely monitored on a very granular level, which enables
> us to proactively manage our business and deliver consistent,
> profitable results. Finally, we have built a strong claims handling
> function internally and play a substantial role in claims management
> and handling activities.

48.     The Company's 2011 Form 10-K also touted its claims administration and handling:

*Claims Administration and Handling.* We provide substantially all claims management and handling services for workers' compensation and most other lines, such as property, auto liability, professional liability, and general liability. Our claims handling is managed by our field offices. Corporate claims monitors the results through self-audits, corporate claim audits, internal controls, and other executive oversight reports. With the exception of MFH, whom we have direct access to their paid and case reserve loss data and perform corporate claims audits, we handle substantially all claims functions for the majority of the programs we manage. Our involvement in claims administration and handling provides benchmarks and valuable feedback to program managers in assessing the client's risk environment and the overall structure of the program.

49.     The statements made in ¶¶46-48 above were each materially false and misleading because they failed to disclose and misrepresent material adverse facts which were known to Defendants or recklessly disregarded by them because contrary to the Company's public portrayal that it had a "Culture of Disciplined Underwriting, Claims Handling & Reserving", Meadowbrook was operating with woefully deficient internal controls, resulting in inaccurate and misleading financial disclosures, including the improper reporting of its loss reserves and goodwill.

50.     Despite the Company's representation that it had a "Culture of Disciplined Underwriting, Claims Handling & Reserving," throughout 2012, a trend emerged where Meadowbrook's reserves for prior year claims (for all of its business lines) increased radically.   This was a direct result of the Company's managing its reserves (which benefited the Company's quarterly financial results) in 2009 to 2011. Thus, by 2012, the Company was drastically under-reserved.

51.     On May 10, 2012, the Company filed a quarterly report for the period ended March 31, 2012 on a Form 10-Q with the SEC. The Form 10-Q contained signed certifications pursuant to Sections 906 of the Sarbanes-Oxley Act of 2002 by Defendants Cubbin and Spaun stating that the financial information contained in the Form 10-Q was

accurate, and disclosed any material changes to the Company's internal control over financial reporting. The Company reported net earned premiums of $192.8 million, total revenues of $216.2 million, total expenses of $206.9 million and net income of $8.1 million or $0.16 per diluted share. The Company further reported total assets of $2.46 billion including goodwill of $120.7 million. The Company disclosed the following regarding an increase in net ultimate loss estimates, "For the three months ended March 31, 2012, we reported *an increase in net ultimate loss estimates for accident years 2011 and prior of $10.2 million*, or 1.2% of $879.1 million of beginning net loss and LAE reserves at December 31, 2011. (emphasis added).

52.    On August 9, 2012, the Company filed a quarterly report for the period ended June 30, 2012 on a Form 10-Q with the SEC. The Form 10-Q contained signed certifications pursuant to Sections 906 of the Sarbanes-Oxley Act of 2002 by Defendants Cubbin and Spaun stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting. The Company reported net earned premiums of $211.3 million, total revenues of $235.1 million, total expenses of $245.1 million and net loss of ($7.7 million) or ($0.15) per diluted share. The Company further reported total assets of $2.54 billion including goodwill of $121.0 million. The Company disclosed the following regarding an increase in net ultimate loss estimates, "For the three months ended June 30, 2012, we reported an *increase in net ultimate loss estimates for accident years 2011 and prior of $28.2 million*, or 3.2% of $879.1 million of net loss and LAE reserves at December 31, 2011. (emphasis added).

53.     On October 18, 2012, the Company issued a press release and warned that it was taking additional expense charges for prior year reserves.   The reserve charge for the third quarter was estimated to be $31.4 million (comprised of $8.5 million for workers compensation, $11.9 million in its multi-peril/general liability line of business and $11 million for commercial auto).

54.     As a result of Meadowbrook's announcement of an additional expense charges for prior year reserves, on October 19, 2012, AMB placed the "A- Rating" of Meadowbrook under review with negative implications (which implied a rating action was imminent). That day, AMB issued a press release which stated the following:

> A.M. Best Co. has placed under review with negative implications the financial strength rating (FSR) of A- (Excellent) and issuer credit ratings (ICR) of "a-" of the subsidiaries of Meadowbrook Insurance Group, Inc. (MIGI) (Southfield, MI) [NYSE: MIG], which operate under an intercompany reinsurance pooling agreement. A.M. Best also has placed under review with negative implications the ICR of "bbb-" of MIGI. (See below for a detailed listing of the companies and ratings.)
>
> The under review status reflects MIGI's preliminary announcement that its third quarter 2012 results will be adversely impacted by an increase in its net ultimate loss estimates for 2011 and prior accident years. The negative implications reflect the reasonable likelihood that the ratings will be downgraded based on this announcement, worse than expected operating results in 2012, the reduction in risk-adjusted capitalization levels and earnings prospects going forward.
>
> The ratings will remain under review pending further discussions between A.M. Best and MIGI's management regarding various capital raising initiatives that are being explored, as well as an in depth view surrounding the degree and nature of the charges taken, any other action plans implemented by management and MIGI's ability to stem another instance of adverse reserve development, if it should arise.

55.     After the Company's credit rating was put under review, the Company's shares fell $1.61 per share or over 20% to close on October 19, 2012 at $6.18 per share.

56.    On November 1, 2012, the Company issued a press release announcing results for the third quarter 2012.  As part of that announcement, the Company disclosed that after further review, it was recording $42.9 million of prior-period reserve additions ($11.5 million more than pre-announced on October 18th).  As part of the announcement, defendant Cubbin stated, "we have put this challenging period of reserve development behind us."  Unfortunately for Plaintiffs and other investors, nothing could have been further from the truth.  Defendant Cubbin could not have honestly held this belief because by this time he knew or should have known that the Company had discontinued its excess line of business and it was experiencing a major problem in one of its workers' compensation line in California.    In fact, after AMB had again downgraded the Company, on August 2, 2013, Defendant Cubbin admitted that there was a problem in the California territory dating back to the middle of 2012.

57.    On November 2, 2012, the Company held its Q3 2012 Earnings Conference Call. During the call defendant Cubbin explained that after the Company had announced the initial estimate of its third quarter reserve position, it added an additional $19.8 million to its prior and current accident year reserves.  Despite the new prior-period reserve additions, during the call defendant Cubbin touted its reserving practices:

> [W]e have top [a] top notch claim handling team and aggressive case reserving practices.   We are confident that our reserves are properly evaluated and held at an appropriate level.   We believe that we have minimized the likelihood of adverse development through our reserving actions and through our underwriting and pricing actions.

58.    On November 9, 2012, the Company filed a quarterly report for the period ended September 30, 2012 on a Form 10-Q with the SEC.  The Form 10-Q contained signed certifications pursuant to Sections 906 of the Sarbanes-Oxley Act of 2002 by

Defendants Cubbin and Spaun stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting. For the three months ended September 30, 2012, the Company reported net earned premiums of $223.4 million, total revenues of $245.5 million, total expenses of $294.2 million and net loss of ($26.26 million) or ($0.53) per diluted share. The Company further reported total assets of $2.69 billion including goodwill of $121.0 million. The Company disclosed the following regarding its reserve charges "For the three months ended September 30, 2012, we reported *an increase in net ultimate loss estimates for accident years 2011 and prior of $42.9 million*, or 4.9% of $879.1 million of net loss and LAE reserves at December 31, 2011." (emphasis added).

59.    In the quarterly filing, the Company also reported that as of September 30, 2012, the Company had $121.0 million of goodwill recorded and that as a result of operating results to date, the updated forecast of the fair value of the specialty insurance operations (SIO) reporting unit has decreased and that it would perform an interim goodwill impairment test as of September 30, 2012. The Company also reported that its excess liability program had been cancelled in October 2012.    While it did not specifically relate this cancelled program to ProCentury, Meadowbrook merged with ProCentury in 2008 for the purpose entering the excess and surplus business lines. Since the interim goodwill test was as of September 30, 2012, Defendants specifically decided to discontinue the excess liability program in October so that it would fall outside the impairment review period. Defendant knew or should have known that Meadownbrook's goodwill was overstated as a result of the failure to report an impairment to goodwill as a result of the discontinuance of this program.    The Defendants' statements that the

goodwill was not impaired were false and misleading at the time they were made and they could not have honestly believed them to be true.

60.     As a result of its reserve issues and the AMB "under review" rating, on December 20, 2012, Meadowbrook was forced to enter into a quota-share reinsurance agreement with SwissRe under which it would cede approximately $90–100 million of unearned premium in 2012 and a similar amount of written premium in 2013.

61.     On March 1, 2013, AMB announced that it would maintain their 'under review' status with negative implications as they continued to evaluate the Company's corrective actions.

62.     On March 8, 2013, the Company filed its 10-K report for the period ended December 31, 2012 with the SEC signed by defendants Cubbin, Spaun and the Company's directors.   In the 2012 10-K, the Company reported goodwill of $121.0 million and disclosed that it would not take an impairment charge for 2012, 2011 or 2010. However, by this time Defendant knew but failed to report any impairment to goodwill as a result of the discontinuance of the liability excess program.

63.     On April 30, 2013, the Company issued a press release announcing results for the first quarter of 2013. Commenting on the quarterly results, defendant Cubbin, stated: "Our first quarter results were consistent with our expectations. We are committed to our business plan and returning to our historic levels of underwriting profitability in the near term. We have enhanced our statutory surplus, stabilized reserves, continued to achieve rate increases in excess of loss ratio trends, and terminated underperforming programs and business."

64.     The statements made in ¶¶51-53, 56-59, 62-63 above were each materially false and misleading at the time that they were made because the Defendants failed to disclose and misrepresented the following material adverse facts which were known to Defendants or reckless disregarded by them:

(a)     that Meadowbrook's reported goodwill and intangible assets were materially overstated;

(b)     that, as a result of its failure to timely write-down goodwill, the Company's financial results during the Class Period were materially overstated;

(c)     that the Company had not stabilized its reserves;

(d)     that the Company's financial statements were not prepared in accordance with GAAP and, therefore, were materially false and misleading;

(e)     that the Company had not terminated all of its underperforming programs;

(f)     that the impairment charges were understated, and goodwill, total assets, stockholders equity, net income and deferred income and taxes were overstated; and

(g)     that the Company failed to develop and implement adequate internal controls to insure that the Company's financial results were adequately reported.

65.     On May 10, 2013, the Company filed a quarterly report for the period ended March 31, 2013 on a Form 10-Q with the SEC. The Form 10-Q contained signed certifications pursuant to Sections 906 of the Sarbanes-Oxley Act of 2002 by Defendants Cubbin and Spaun stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting. For the three months ended March 31, 2012, the Company reported net earned premiums of $170.5 million, total revenues of $191.6 million, total expenses

of $183.2 million and net income of $7.1 million or $0.14) per diluted share. The Company further reported total assets of $2.85 billion including goodwill of $121.0 million. There was no change in the goodwill.

66.     On July 30, 2013, the Company issued a press release announcing results for the second quarter of 2013. The Company reported for the six months ended June 30, 2013 a net loss of ($4.4 million), or ($0.09) per diluted share, as compared to a net income of $0.4 million, or $0.01 per diluted share, for the same period in 2012. For the six months ended June 30, 2013 net operating loss, a non-GAAP measure the Company defines as net loss excluding after-tax realized gains and losses, was ($6.7 million), or ($0.13) per diluted share, as compared to a net operating loss of ($1.2 million), or ($0.02) per diluted share for the same period in 2012. For the six months ended June 30, 2013 net operating loss, excluding the impact of the quota share surplus relief treaty, was ($2.6 million), or ($0.05) per diluted share.  The Company reported goodwill of $121.00 million. Commenting on the results, Cubbin, stated:

> After a decent, but not great first quarter in 2013, wherein we showed operating income of $0.14 per share or $6.9 million, the second quarter was negatively impacted by an unexpected adverse reinsurance arbitration result, development on prior accident year reserves relating to an isolated territory in the discontinued business and from an above average level of storms in the second quarter. Our change in prior accident year ultimate reserve estimates on ongoing business was slightly favorable in the second quarter.  We are optimistic that the actions taken in 2012 and in the first quarter of 2013 to enhance our statutory surplus position, increase our capital adequacy and lower our gross and net written premium to statutory surplus leverage ratios, and solidify pricing adequacy positions us well for the second half of 2013 and 2014.

67.     The statements made in ¶¶65-66 above were each materially false and misleading because they failed to disclose and misrepresent the following material adverse facts which were known to Defendants or reckless disregarded by them:

(a)    that Meadowbrook's reported goodwill and intangible assets were materially overstated;

(b)    that, as a result of its failure to timely write-down goodwill, the Company's financial results during the Class Period were materially overstated;

(c)    that the Company had not stabilized its reserves;

(d)    that the Company's financial statements were not prepared in accordance with GAAP and, therefore, were materially false and misleading;

(e)    that the Company had not terminated all of its underperforming programs;

(f)    that the impairment charges were understated, and goodwill, total assets, stockholders equity, net income and deferred income and taxes were overstated; and

(g)    that the Company failed to develop and implement adequate internal controls to insure that the Company's financial results were adequately reported.

68.    On July 31, 2013, the Company held its Q2 2013 Earnings Conference Call. During the call defendant Cubin was asked the following question regarding goodwill:

> Analyst:  I had a question about the goodwill.  Is there any chance of a goodwill impairment at this point for anything?
>
> Cubbin:  Doug, we do a goodwill analysis periodically as events require, and the most recent goodwill analysis we did, we passed.

69.    On August 2, 2013, Meadowbrook was downgraded by AMB.   AMB cited several specific reasons for its downgrade, including a $21.4 million prior year adverse loss reserve and discontinuance of a territory in the Company's California workers' compensation line.  That day AMB issued the following press release entitled

"A.M. Best Downgrades Ratings of Meadowbrook Insurance Group, Inc. and Its Subsidiaries" stated:

> A.M. Best Co. has downgraded the financial strength rating (FSR) to B++ (Good) from A- (Excellent) and issuer credit ratings (ICR) to "bbb+" from "a-" for the subsidiaries of Meadowbrook Insurance Group, Inc. (MIGI) (Southfield, MI) [NYSE: MIG], which operates under an intercompany reinsurance pooling agreement. A.M. Best also has downgraded the ICR to "bb+" from "bbb-" for MIGI. The outlook for the FSR has been revised to stable from negative, while the outlook for the ICRs is negative. (See below for a detailed listing of the companies and ratings.)
>
> The rating downgrades take into consideration MIGI's second quarter 2013 earnings announcement and the weaker than anticipated results due in large part to $21.4 million of prior year adverse loss reserve development and $8.2 million of pre-tax losses (on prior years) the result of adverse reinsurance arbitration. In the second quarter of 2013, MIGI reported a net operating loss of $4.4 million.
>
> According to MIGI's management, $19.8 million of prior year development stemmed from a discontinued territory within the California workers' compensation line. At the same time, MIGI experienced above average storm losses of $12.9 million in the same quarter and an unexpected loss in an arbitration hearing over ceded losses. The rating actions follow the negative outlook that was assigned to MIGI and its subsidiaries at the time A.M. Best affirmed its ratings in April along with the likelihood of potential negative rating actions if further adverse reserve development occurred.
>
> Due to A.M. Best's concerns regarding MIGI's overall reserve adequacy and the potential for future adverse development, the negative outlook on the ICRs has been maintained. This applies to both continued and discontinued lines, which reflects additional concerns A.M. Best has regarding the ultimate development on some of MIGI's more recent accident years. A.M. Best will continue to monitor MIGI's capitalization to ensure that it remains within an acceptable range for its current rating level.

70.     On this news Meadowbrook common stock declined $1.00 per share and closed at $6.74 per share on Monday, August 5, 2013, on high volume of over 3.4 million shares or nearly nine times the average daily volume.

71.     That same day, the Company issued a press release commenting on AMB's decision to downgrade its rating. Cubbin stated, "We were very disappointed by today's decision by A.M. Best to downgrade our rating to B++ (stable)." Defendant Cubbin did not disclose that the AMB August 2, 2013 downgrade would be considered a triggering event resulting in the need to perform an interim impairment review of goodwill. Instead, Defendant Cubbin disclosed that the Company needed to "make arrangements with an A rated insurance company to issue policies in those programs and lines of business for which such a rating is required."

72.     On August 9, 2013, Meadowbrook announced that it has filed a Form 12b-25 with the U.S. Securities and Exchange Commission to allow it to file Form 10-Q for the period ending June 30, 2013 by August 14, 2013.

73.     It was not until August 9, 2013, when Defendants knew that the Company could no longer continue to report overstated goodwill, Defendants decided that the August 2, 2013, AMB rating downgrade was a trigging event which would result in the need to perform an interim impairment review of goodwill and, in fact, finally write down the goodwill they knew was impaired.

74.     On this news, Meadowbrook securities declined a further $0.19 per share or over 2%, to close at $6.60 per share on August 12, 2013.

75.     On August 14, 2013, the Company filed a quarterly report for the period ended June 30, 2013 on a Form 10-Q with the SEC. The Form 10-Q contained signed

certifications pursuant to Sections 906 of the Sarbanes-Oxley Act of 2002 by Defendants Cubbin and Spaun stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting. As part of the filing, the Company announced that it would take a non-cash impairment of goodwill of $115.4 million in the three months ended June 30, 2013. The impairment charge wiped out 95% of the Company's goodwill on its balance sheet, and caused the Company to violate "financial covenants" applicable to the certain credit facilities.

76.     On the news of the impairment charge the Company's shares fell $0.13 per share to $6.43 per share on August 15, 2013, a decline of 1.83%.

## NO SAFE HARBOR

77.     Meadowbrook's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from protection of the statutory Safe Harbor. *See* 15. U.S.C. §78u-5(b)(2)(A).

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

78.     Throughout the Class Period, Plaintiffs and the members of the Class justifiably expected the Defendants to disclose material information in connection with the offering and sale of the Company's stock. Plaintiffs and the members of the Class would not have purchased the Company's stock at artificially inflated prices if Defendants had disclosed all material information, including the fact that Meadowbrook

was operating with woefully deficient internal controls, resulting in the Company improperly accounting for its reserves and goodwill. Thus, reliance by Plaintiffs and the Class members should be presumed with respect to Defendants' omissions of material information.

79.     Throughout the Class Period, the Company's stock traded in an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the prices of the Company's stock.

80.     The following facts demonstrate that the market for Meadowbrook's common stock was efficient at all time during the Class Period: (a) Meadowbrook's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market; (b) as a regulated issuer, Meadowbrook filed periodic public reports with the SEC and the NYSE; (c) Meadowbrook regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (d) Meadowbrook was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

81.     As a result of the foregoing, the market for Meadowbrook common stock promptly digested current information regarding the Company from all publicly available

sources and reflected such information in the stock price. Plaintiffs and the other Class members relied on the integrity of the market price for the Company's stock and are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

82.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Meadowbrook common stock and operated as a fraud or deceit on Class Period purchasers of Meadowbrook common stock by misrepresenting the value of the Company's business and concealing the significant defects in its accounting, internal controls and reserve process.   As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Meadowbrook's common stock fell precipitously, as the prior artificial inflation came out of the price.   As a result of their purchases of Meadowbrook common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

### COUNT I
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 of the Securities and Exchange Commission
### (Against All Defendants)

83.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84.     This Count is asserted against all Defendants pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

85.     As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

86.     Defendants' false and misleading statements and omissions were intended to, and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially inflate and maintain the market for and market price of the Company's stock; and (iii) cause Plaintiffs and the other members of the Class to purchase the Company's stock at inflated prices.

87.     Defendants were each individually and collectively responsible for making, and authorized to make, one or more of the statements and omissions alleged herein, by virtue of having made false or misleading verbal statements during the quarterly earnings call and during analyst conferences, or by virtue of having prepared, reviewed, commented on, approved, signed, and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

88.     As described above, Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and other members of the Class who purchased Meadowbrook stock during the Class Period.

89.    Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's stock.

90.    In ignorance of the false and misleading nature of the Company's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements and/or upon the integrity of the market price for Meadowbrook stock, Plaintiffs and the other members of the Class purchased Meadowbrook stock at artificially inflated prices during the Class Period.

91.    But for the fraud, they would not have purchased the stock at artificially inflated prices.

92.    The market price for Meadowbrook stock declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by Meadowbrook and the Individual Defendants, as described above.

93.    Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Meadowbrook stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

94.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiffs for damages suffered in connection with Plaintiffs' transactions in Meadowbrook's common stock during the Class Period.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

95.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     This Count is asserted against the Individual Defendants under Section 20(a) of the Exchange Act.

97.     As alleged above, Meadowbrook violated Section 10(b) and Rule 10b-5, promulgated thereunder, by making false and misleading statements in connection with the purchase or sale of securities. This fraudulent conduct was undertaken with scienter because Meadowbrook is charged with the knowledge and scienter of the Individual Defendants and others who knew of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme.

98.     Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Meadowbrook stock as a direct and proximate result of those violations of Section 10(b) and Rule 10b-5 by Meadowbrook, among others.

99.     The Individual Defendants were controlling persons of Meadowbrook within the meaning of Section 20(a) of the Exchange Act by reason of their positions as senior executive officers and/or directors of Medowbrook, their ability to approve the content and issuance of Meadowbrook's public statements, and their control over Meadowbrook's day-to-day operations. The Individual Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and,

therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same.

100.   The Individual Defendants prepared, signed, and/or approved the Company's press releases and SEC filings that contained material false and misleading statements or omitted material facts. They were provided with or had unrestricted access to copies of those statements prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be made.

101.   The Individual Defendants did not act in good faith in connection with the conduct at issue in this claim.

102.   The Individual Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or they acted with reckless disregard for the truth.

103.   By virtue of their positions as controlling persons of Meadowbrook, the Individual Defendants are jointly and severally liable to Plaintiffs pursuant to Section 20(a) of the Exchange Act for Meadowbrook's violations of Section 10(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, as follows:

A.   Determining that this action is a proper class action and certifying Plaintiffs as the class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all of the Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein;

C.      Awarding Plaintiffs and the Class their fees and expenses incurred in this action, including attorneys' fees and expert fees;

F.      Awarding Plaintiffs and other members of the Class prejudgment interest and/or opportunity cost damages; and

G.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 7, 2013

**ABBEY SPANIER, LLP**

By: _____

Arthur N. Abbey
Richard B. Margolies
212 East 39th Street
New York, NY  10016
Tel.: 212-889-3700
Fax: 212-684-5191

*Attorneys for Plaintiffs*

37

## CERTIFICATION OF LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Melvin Salberg and Anita Salberg on behalf of Family Estates Development Company Inc., declare as follows:

1.    We have reviewed a copy of the complaint filed in this action.

2.    We did not purchase the security that is the subject of this action, Meadowbrook Insurance Group, Inc. (NYSE:  MIG),  at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.    We are willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    Our transactions in Meadowbrook securities during the class period identified in Complaint are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase) | Quantity | Trade Date | Price Paid |
|---|---|---|---|---|
| Common | Purchase | 2000 | February 2, 2012 | $20,000 |
| Common | Purchase | 1000 | April 30, 2012 | $8,970 |
| Common | Purchase | 1000 | April 30, 2012 | $8,970 |
| Common | Purchase | 2000 | May 30, 2012 | $17,960 |

| Security (Common Stock, Call, Put, Bonds) | Transaction (Sale) | Quantity | Trade Date | Proceeds |
|---|---|---|---|---|
| Common | Sale | 2000 | August 16, 2013 | $12,616.78 |
| Common | Sale | 1000 | August 16, 2013 | $6,308.39 |
| Common | Sale | 2000 | August 21, 2013 | $17,850.89 |

5.    I have not served as or sought to serve as a representative party on behalf of a class during the last three years, except as stated herein:

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   October 4, 2013

Signed: _____
Anita Salberg on behalf of Family Estates Development Company Inc.

Dated:   October 4, 2013

Signed: _____
Melvin Salberg on behalf of Family Estates Development Company Inc.

Print Name: _____

2

## CERTIFICATION OF LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Anita Salberg, declare as follows:

1.  I have reviewed a copy of the Complaint filed in this action.

2.  I did not purchase the security that is the subject of this action, Meadowbrook Insurance Group, Inc. (NYSE: MIG), at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Meadowbrook securities during the class period identified in Complaint are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase) | Quantity | Trade Date | Price Paid |
|---|---|---|---|---|
| Common | Purchase | 2000 | January 12, 2012 | $22,730.55 |
| Common | Purchase | 700 | February 2, 2012 | $7,000 |
| Common | Purchase | 1300 | February 2, 2012 | $13,000 |
| Common | Purchase | 2000 | April 30, 2012 | $17,940 |
| Common | Purchase | 2000 | May 30, 2012 | $17,960 |
| Security (Common Stock, Call, Put, Bonds) | Transaction (Sale) | Quantity | Trade Date | Proceeds |
| Common | Sale | 2000 | August 16, 2013 | $12,619.77 |
| Common | Sale | 700 | August 16, 2013 | $4,416.93 |
| Common | Sale | 1,300 | August 16, 2013 | $8,189.99 |
| Common | Sale | 2000 | August 22, 2013 | $12,096.39 |
| Common | Sale | 2000 | August 22, 2013 | $12,098.39 |

5.  I have not served as or sought to serve as a representative party on behalf of a class during the last three years, except as stated herein:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   October 4, 2013

Signed: _____
Anita Salberg

Print Name: _ANITA SALBERG_

2